**UNITED STATES DISTRICT COURT**            **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| ERIC CURTIS, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| *versus* | § | |
| | § | CIVIL ACTION NO. 1:17-CV-500 |
| JARED L. ALBANESE, ADAM S. | § | |
| JACKSON, and PARAMOUNT | § | |
| RARE COINS & CURRENCY, L.L.C., | § | |
| | § | |
| Defendants | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff Eric Curtis ("Curtis" or "Plaintiff") complains of the actions of Defendants Justin L. Albanese ("Albanese"), Adam S. Jackson ("Jackson"), and Paramount Rare Coins & Currency, LLC ("PRCC") (together, "Coin Dealer Defendants"), files this his First Amended Complaint and respectfully shows the following:

## NATURE OF THE CASE

1.    This action is brought under 18 U.S.C. §§ 1961-1968 (Racketeer Influenced and Organized Crime Act and Texas common law by Plaintiff Eric Curtis ("Curtis") against Justin L. Albanese (RICO Defendant), Adam S. Jackson (RICO Defendant), and Paramount Rare Coins & Currency, LLC (RICO enterprise) and Texas common law for their unlawful, false, misleading and unconscionable misrepresentations and sales tactics that resulted in damages of over $112,000.00 to purchase collectible numismatic, semi-numismatic, and bullion coins that are not worth the value at which they were purchased and will never attain the value as claimed or return on investment as represented.   Curtis seeks to rescind his purchase and/or recover actual

1

damages, consequential damages, punitive damages, statutory treble damages, pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

**2.**    Justin L. Albanese (RICO Defendant) conducted and/or participated in the business and financial affairs of Paramount Rare Coins & Currency, LLC (the RICO enterprise) through a pattern of racketeering activity; to wit: Justin L. Albanese engaged in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated unlawful coin sales to Curtis that, in turn, generated exorbitant compensation for him. Justin L. Albanese caused PRCC to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts and/or other purchase confirmations to Curtis.

**3.**    By his unlawful acts, Justin L. Albanese (i) conducted and/or participated in the affairs of PRCC (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and(c) (in violation of 18 U.S.C. §1962(d)), and defrauded Curtis in the process.  Justin L. Albanese committed these substantive RICO offenses by causing PRCC to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself.  Justin L. Albanese knew that making and/or sending fraudulent solicitations, sales receipts and/or purchase confirmations to Curtis was fraudulent, misleading and unlawful.  Justin L. Albanese knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to Curtis that, in turn, would generate exorbitant compensation for him.  Justin L. Albanese engaged in the scheme to take unfair advantage of Curtis, a pipeline worker of modest means. Justin L. Albanese's wrongful acts proximately and/or directly caused Curtis to be substantially overcharged for the coins.

4.      Adam S. Jackson (RICO Defendant) conducted and/or participated in the business and financial affairs of PRCC (the RICO enterprise) through a pattern of racketeering activity; to wit: Adam S. Jackson participated, directly and indirectly, with Justin L. Albanese in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated unlawful coin sales to Curtis that, in turn, generated exorbitant compensation for them.  In association with Justin L. Albanese, Adam S. Jackson caused PRCC to use the interstate mails and wires to repeatedly make and/or send fraudulent coin sales receipts and/or other purchase confirmations to Curtis .

5.      By his unlawful acts, Adam S. Jackson (i) conducted and/or participated in the affairs of PRCC (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and(c) (in violation of 18 U.S.C. §1962(d)), and defrauded Curtis in the process.  Adam S. Jackson committed these substantive RICO offenses by causing PRCC to engage, directly or indirectly, in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself.  Adam S. Jackson knew that providing fraudulently graded coins to Justin L. Albanese for ultimate sale, invoicing and/or purchase confirmations to Curtis was fraudulent, misleading and unlawful.  Adam S. Jackson knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to Curtis and those similarly-situated, that, in turn, would generate exorbitant compensation for him.  Adam S. Jackson engaged in the scheme to take unfair advantage of Curtis, a pipeline worker of modest means.  Adam S. Jackson's wrongful acts proximately and/or directly caused Curtis to be substantially overcharged for the coins.

6.      This action is brought under 18 U.S.C. §§ 1961-1968 and Texas common law by Plaintiff Eric Curtis ("Curtis") against the Coin Dealer Defendants under 18 U.S.C. §§ 1961-1968 and

Texas common law for their unlawful, false, misleading and unconscionable misrepresentations and sales tactics that resulted in damages to Curtis of over $112,000.00. to purchase collectible numismatic, semi-numismatic, and bullion coins that are not worth the value at which they were purchased and will never attain the value as claimed or return on investment as represented. Curtis seeks to rescind his purchase and/or recover actual damages, consequential damages, punitive damages, statutory treble damages, pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Curtis's claims pursuant to (i) 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and the Parties are citizens of different states (diversity), and (ii) 28 U.S.C. § 1367 (supplemental jurisdiction). This Court also has *in personam* jurisdiction over Defendants because at all relevant times, Defendants resided, maintained citizenship, were found, had agents, conducted business and/or sold the collectible numismatic, semi-numismatic, and bullion coins at issue in this case to Curtis in and/or from the Eastern District of Texas.

8.     At all relevant times, Defendants resided, were found, had agents and/or conducted business in the Eastern District of Texas. Defendants sold the collectible numismatic, semi-numismatic, and bullion coins at issue in this case to Curtis in and/or from the Eastern District of Texas. A substantial part—if not all—of Defendants' wrongful acts and omissions occurred in the Eastern District of Texas. Accordingly, venue is proper in the Eastern District of Texas pursuant to 28 U.S.C § 1391(a).

## PARTIES

9.     Plaintiff Eric Curtis ("Curtis") is a citizen and resident of Bastrop, Morehouse Parish, Louisiana.

10.    Defendant Justin L. Albanese is a citizen and resident of Lumberton, Hardin County, Texas.  His address is 303 Winding Brook Dr., Lumberton, Hardin County, TX 77657. Albanese is the principal owner and managing member of Defendant Paramount Rare Coins & Currency, LLC.

11.    Defendant Adam S. Jackson is a citizen and resident of Lumberton, Texas.  His address is 5640 Westchase Lane, Lumberton, TX 77657.  Jackson is an owner and member of Defendant Paramount Rare Coins & Currency, LLC.

12.    Defendant Paramount Rare Coins & Currency, LLC, is a Texas limited liability company with its principal place of business is located at 230 Country Lane Drive, Lumberton, TX 77657. PRCC markets and sells collectible numismatic, semi-numismatic, and bullion coins directly to consumers over the telephone and via its website, http://www.paramountrcc.com.  PRCC is principally owned and controlled by Albanese and Jackson.  Albanese and Jackson managed, operated and treated Defendant PRCC as their personal bank account (and continues to do so) in such a way that PRCC is their alter ego because corporate formalities are not followed, separate and distinct books and records are not maintained.  PRCC is undercapitalized and the line between owner/manager and the entity is substantially blurred to the point that it is difficult—if not impossible—to determine where Albanese/Jackson ends, and PRCC begins.  PRCC exists as a mere tool and business conduit for Albanese/Jackson and possibly other owners, which has resulted in an injustice to Curtis and the diminution of available resources from which Curtis may obtain satisfaction of the damages directly and/or proximately caused by Defendants'

wrongful conduct.  Defendants' counsel, Mr. Bruce Partain, Wells Peyton Greenberg & Hunt, LLP, 550 Fannin St., Suite 600, Beaumont, Texas, 77701 has agreed to accept service by regular mail of this Original Complaint and Jury Demand.

## FACTUAL BACKGROUND

13.     Defendants operate a sales and telemarketing operation for the purpose of selling collectible numismatic, semi-numismatic, and bullion coins[1] directly to consumers over the telephone and via the internet.  Defendants themselves and through various employees make hundreds of intrastate and interstate sales calls per month — via the telephone — utilizing one or more of the following unlawful, false, misleading and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry:

    (i)    fabricating stories about the attributes of the coins;

    (ii)    representing qualities of the coins and guaranteeing the coin investments will substantially appreciate, knowing their representations are false and misleading;

    (iii)    convincing customers to "max out" their credit cards, to purchase "unique" coins— that, in fact, are not unique;

    (iv)    offering customers a "money back guarantee" with no intention of ever honoring the guarantee:

    (v)    advising customers to purchase unique and/or rare coins, when the coins are neither unique nor rare;

    (vi)    representing to customers that their coins will outperform other types of investments— without any specific underlying data supporting such assertions;

    (vii)    failing to follow client directives on the sale or purchase of coins;

    (viii)    intentionally delaying transactions to obtain better margins that are not passed on to the customer; and,

---

[1]  The term "numismatic" refers to collectible coins whose value is based upon qualities other than the metal content of the coin, such as appearance, population, grade, rarity, etc..  "Semi-numismatic" refers to a coin whose value partially derives from its numismatic value and partially from the value of its precious metal content.  Bullion coins derive their value almost entirely from the fair market value of the precious metal content.

(ix)    various other acts and practices that may be uncovered during discovery.

14.  Through a series of related transaction that began in 2008 through 2015, Defendants by and through their employee/representatives, including Raymond Padia and Jim Pomirko, developed a professional relationship with Curtis and convinced him to purchase numismatic, semi-numismatic and bullion coins as investments.   Curtis purchased various coins from Defendants as investments, but through misrepresentation and fraud, was damaged in the amount of approximately One Hundred Twelve Thousand Dollars ($112,000.00).   These series of purchases were based upon sales tactics and representations made by the Defendants: that the coins were unique and Curtis would have a limited opportunity to buy the coins; that he would realize a substantial return on his investment; that the coins were a safe investment; and, that Curtis would purchase the coins at a fair market value.  For example, on June 25, 2014, Defendants' representative, Raymond Padia, in a cell phone text represented that the coins Curtis would buy would increase in value: *"Either way big things are happening with the $50 MS 70 Roman Numeral coins and I feel this year will be the last year to pick these coins up for under 10,000."*  In truth, at that time and today, that coin is worth much less than represented.   Similar text messages occurred over the course of dealings between the parties from 2014 through 2016.   Those text messages ended abruptly when Curtis sought to sell coins back at or near the price he paid for them, as represented by Defendants. Defendants' representative told Curtis "*If it were that easy that would be nice but since you don't understand coins, after that statement then, No more texting me on my personal phone!* "

7

15.     Defendants mislead Curtis and enticed him into believing the coins were a sound investment, that he was getting "good deals," and that the coins were unique and/or rare.  Over a six year period, Defendants failed to advise Curtis that he was paying substantially more than the fair market price and incurring immediate and substantial losses with each transaction, to wit:

(a) Sometime in late 2010, Curtis was convinced by Defendants, by and through their salesmen, to purchase complete sets of 1986 - 1991 Gold American Eagles (GAE) (NGC grade MS-69)[2] for $28,000.00 as a sound and safe investment.  In reality, the fair market value of the coins was under $15,000.00, resulting in an unconscionable loss to Curtis of over $13,000.00.  Today, the coins still have not obtained the value as represented and will never reached a level of return of investment as represented by Defendants.

(b) On or about 4/10/2014, Defendants, by and through their salesmen, advised Curtis to purchase a 1986 $25 GAE MS-70 coin for $3,650 claiming it was a good value when its fair market value was approximately $1,500.00, resulting in substantial loss of his investment of $2,150.00, more than half the purchase price.

(c) On or about 4/11/2014, Defendants, by and through their salesmen, convinced Curtis purchase a 1986 $10 GAE MS-70 coin for $2,500.00, when the fair market value was approximately $1,300.00.  Defendants did not advise Curtis that his investment in this coin resulted in a loss of $1,200.00.

(d) On or about 4/22/2014, Defendants, by and through their salesmen, convinced Curtis to purchase a 1991 $10 GAE MS-70 coin for $5,000.00 when its fair market value was about $1,650.00, resulting in an undisclosed loss of $3,350.00.

---

[2] MS-69 is a reference to "Mint State 69."  The coin's grade is a numerical value, commonly referred to as the Sheldon scale that ranges between 1 and 70.  The most valuable coins are uncirculated coins, commonly referred to as mint state (MS) and designated with grades from 60 to 70.  Thus, a coin with a grade MS-70 is a perfect coin in original, uncirculated condition.  The numerical grade is assigned based on a number of attributes, such as luster (i.e. shininess), strike (i.e. how well the mint connected with the blank coin in manufacturing), and color (i.e. the dye variations used in striking the coin). The premier professional grading services are Numismatic Guaranty Corporation (NGC) and Professional Coin Grading Services (PCGS).

(e) On or about 4/30/2014, Defendants, by and through their salesmen, convinced Curtis to purchase a 1991 GAE PF-70[3] four-coin set for $9,800.00 when its fair market value was about $3,300.00. Defendants had just taken Curtis for $6,500.00.

(f) On or about 5/22/2014, based upon Defendants' representations, Curtis purchased two 1988 $50 GAE PF-70 coins for $6,150.00 when the fair market value was about $3,500.00. This resulted in an undisclosed and immediate loss of $2,650.00.

(g) On or about 6/3/2014, based upon Defendants' representations, Curtis purchased a 1987 $50 GAE coin for $5,900.00 when the fair market value was about $1,600.00, resulting in an immediate and undisclosed loss of $4,800.00.

(h) On or about 6/5/2014, and at Defendants' urging and misrepresentations, Curtis agreed to trade the six "1986 - 1991 MS-69 GAE Sets" for a "Pre-1933 Type Set."[4] Defendants claimed both sets in the trade had a fair market value of $40,000.00, so this was represented to be an "even trade." To further entice Curtis, Defendants represented that the "Pre-1933 Type Set" were older numismatic coins with more stability and predictability than the semi-numismatic modern coins. In truth, the fair market value of the "1986 - 1991 MS69 GAE Sets" was approximately $25,839.00 and the "Pre-1933 Type Set" was approximately $10,182.00. By following the Defendants' financial advice, Curtis was defrauded of $15,657.00 in the transaction.

(i) On or about 7/2/2014, based upon Defendants' representations, Curtis purchased a 1986 $50 GAE MS-70 coin for $6,400.00 when the fair market value was $2,500.00, resulting in an undisclosed loss to Curtis of $3,900.00.

(j) On or about 7/2/2014, based upon Defendants' representations, Curtis purchased a 1986 $5 GAE MS70 coin for $1,200.00. The fair market value was $646.00, resulting in an undisclosed loss of $554.00.

---

[3] PF-70 stands for "Proof" coinage that, historically, was a limited number of special early strikes of a coin for checking the metal dies used to press the image into the metal, and for archival purposes. However, nowadays, the mint often strikes "proofs" in greater numbers to service coin collectors.

[4] The Pre-1933 Type Set was composed of the following coins: 1861 $1 GAE MS-62, 1878 $3 GAE MS-62, 1894 $10 Liberty MS-62, 1926 $10 Indian Head MS-62, 1924 $20 St. Gaudens MS-64, 1925 $20 St. Gaudens MS-64, "Common Date" $2.5 Indian Head MS-62, "Common Date" $20 Liberty MS-62, "Common Date" $5 Liberty MS-62, and a "Common Date" $5 Indian Head MS-62 (Common Date is a term to designate coins in relative abundance due to the unusually high production numbers of a given year.

**(k)**  On or about 7/14/2014, based upon Defendants' representations, Curtis purchased a 1986 $50 GAE PF-70 for $2,100.00 but had a fair market value of $ 646.00, resulting in an undisclosed loss of $1,454.00.

**(l)**  On or about 7/21/2014, based upon Defendants' representations, Curtis purchased a 1988 $50 GAE MS-70 coin for $6,500.00, but had a fair market value of $3,760.00.  Unknown to Curtis, he incurred a loss of $2,740.00.

**(m)**  On or about 8/19/2014, Defendants advised Curtis to purchase a 1992 $25 GAE PF-70 Cameo coin for $8,600.00.  It had a fair market value of only $999.00, which resulted in a loss of $7,601.00.  For payment, Defendants convinced Curtis to trade one 1988 $50 GAE PF-70 coin plus a payment of $5,000.00.

**(n)**  On or about 9/17/2014, based upon Defendants' representations, Curtis purchased a 1995 $25 GAE MS-70 coin for $8,900.00, but had a fair market value of $5,875.00.  Unknown to Curtis, he had an immediate loss of $3,025.00.

**(o)**  On or about 10/29/2014, based upon Defendants' representations, Curtis purchased a 1991 $25 GAE MS-70 coin for $12,500.00, but had a fair market value $7,703.00.  The immediate loss to Curtis was an overcharge of $4,797.00. For payment of the $12,500.00, Defendants convinced Curtis to trade one 1988 $50 GAE PF-70 coin plus an additional payment of $9,000.00.

**(p)**  On or about 4/1/2015, based upon representations that Defendants would purchase any of Curtis's coins at fair market value, Curtis contacted Defendants to convert some of the coins back to cash. Defendants offered to purchase the 1988 $50 GAE MS-70 and the 1995 $25 GAE MS-70.  Curtis tendered the coins to Defendants and Defendants sent Curtis a package collectively represented to be valued at $10,000.00, containing a $5,000.00 check, a 2015 GAE MS-70 four-coin set and two 2013-W $50 G REV PF-70 Buffaloes.  At the time of the sell, and unknown to Curtis, the fair market difference of the cash and coins traded resulted in Curtis suffering a loss of $5,400.00.

**(q)**  On or about 5/1/2015, based upon Defendants' representations, Curtis purchased a 1987-1991 $25 GAE PF-69 five-coin set for $6,000.00, but only had a fair market value of $3,500.00.  Curtis suffered a loss of $2,500.00.

    **(r)** On or about 6/17/2015, based upon Defendants' representations, Curtis purchased a 1989 $25 GAE MS-70 coin for $21,000.00, which had a fair market value of $8,225.00. Curtis suffered a loss on the overcharge of $12,775.00.

**16.**    On February 2, 2016, Curtis suffered an on-the-job injury and realized the need to convert some of the coins back to cash to cover unanticipated medical and living expenses. Curtis contacted Defendants and explained the situation. Consistent with many prior assurances, Defendants stated it would be no problem and indicated they could get Curtis at least $20,000.00 by the end of the year. However, Defendants began a series of delaying tactics, designed to discourage or prevent Curtis from recognizing the ruse they had perpetrated:

    **(a)** On June 8, 2016, Defendants contacted Curtis requesting him to send in two 2013-W $50 G REV PF-70 Buffaloes and a 2006 W $25 GAE MS-70 coin. Curtis informed Defendants he did not own a 2006 W $25 GAE MS-70. Defendants indicated they would review Curtis's portfolio and get back to him.

    **(b)** Nearly a month later, on Tuesday July 5th, Cutis had not heard back from Defendants and contacted them again. Defendants indicated they would get back to him in a couple of days. Defendants did not contact Curtis as promised.

    **(c)** On Monday, July 25, 2016, Curtis again contacted Defendants and they wrote back to Curtis to send the two 2013-W $50 G REV PF-70 Buffaloes along with anything else Curtis wanted to sell.

    **(d)** On Wednesday July 27, 2016, Curtis contacted Defendants to clarify what to send as he was not knowledgeable as to what other coins would be appropriate for sale. Defendants promised to call back shortly, but never did.

    **(e)** On Friday July 29, 2016, Curtis contacted Defendants requesting a phone call. Defendants texted him back indicating they had a buyer for the two 2013-W $50 G REVPF70 Buffaloes, the 1986 $50 GAE MS70, and the 1986 $50 GAE PF70.

    **(f)** On Monday August 1, 2016, Defendants indicated they did not obtain a commitment from the buyer of the two 2013-W $50 G REVPF70 Buffaloes, the 1986 $50 GAE MS70,

and the 1986 $50 GAE PF70 but requested the coins be shipped to Defendants and they would schedule a pickup. Nothing happened.

(g) On Monday August 8, 2016, and after not hearing about the pickup, Curtis contacted Defendants and volunteered to ship the coins. They agreed.

(h) On Thursday August 18, 2016, after hearing nothing, Curtis contacted Defendants and learned that Defendants had sold the coins for $7000.00. Curtis expressed his disapproval and that he had not agreed upon the sell. Defendants instructed Curtis to shred the check and promised to return the coins. Defendants continued to encourage Curtis to sell the coins and a loss with such a "down market" was not bad. At this point, Curtis became suspicious that the "investment" in coins was nothing like the Defendants represented and instructed Defendants to return the coins.

(i) On Wednesday August 31, 2016, Curtis contacted Defendants to inquire as to the status of the return of the coins. Defendants promised to investigate and let him know.

(j) Three weeks later, on Wednesday September 7, 2016, Curtis contacted Defendants again to inquire as to the status of the return of the coins. Defendants then informed Curtis that they were in the process of finding "replacement" coins.

(k) Since that date, neither the replacement coins nor the update has occurred. As it currently stands, Defendants have illegally retained or converted the 1986 $50 GAE MS-70 coin (purchased at $6,400.00), the 1986 $50 GAE PF-70 (purchased at $2,100.00), and the two 2013-W $50 G REV PF-70 Buffaloes (Defendants represented value of $2,500.00).

17.    In addition to the overcharges and fraud noted above, there is a $2,100.00 charge on Curtis's Mastercard dated 7/7/2014 which does not fit into any part of these "investments." Purchases from 7/2/2014 to 8/19/2014 total $21,200.00, yet coin costs (including credits for trade-ins) amount to only $19,100.00, resulting in a $2,100.00 overcharge. Additionally, from 1/28/2015 to 6/17/2015 total coin costs were $27,000.00. However, taking all credits for trade-ins of $8500.00, there should be credit card charges of $18,500.00, yet total credit card charges amounted to $19,000.00, resulting in a $500.00 overcharge. These charges were hidden by

confusing trades, swaps, and house credits that would sit for months. It was only after careful review of the other fraudulent transactions were these overcharges discovered.

18.     Due to suspicions that arose in late 2016, Curtis had an appraisal performed by a professional numismatist and learned that he had significantly overpaid for the coins and that he would never realize a return on investment as represented by the Defendants. A summary of the transactions reveals the following:

| Date | Items | Price | FMV | Difference |
|------|-------|-------|-----|-----------|
| 2010 | 1986 - 1991 GAE sets  MS67+ | $ 28,000.00 | $ 15,000.00 | $ 13,000.00 |
| 4/10/2014 | 1986 $25 GAE MS-70 | $ 3,650.00 | $ 1,500.00 | $ 2,150.00 |
| 4/11/2014 | 1986 $10 GAE MS-70 | $ 2,500.00 | $ 1,300.00 | $ 1,200.00 |
| 4/22/2014 | 1991 $10 GAE MS-70 | $ 5,000.00 | $ 1,645.00 | $ 3,355.00 |
| 4/30/2014 | 1991 GAE PF-70 set (4 coin set) | $ 9,800.00 | $ 3,269.25 | $ 6,530.75 |
| 5/22/2014 | 1988 $50 GAE PF 70 (2 coins) | $ 6,150.00 | $ 3,525.00 | $ 2,625.00 |
| 6/3/2014 | 1987 $50 GAE | $ 5,900.00 | $ 1,645.00 | $ 4,255.00 |
| 6/5/2014 | Pre-1933 Type Set (10 coins) | $ 25,839.00 | $ 10,182.00 | $ 15,657.00 |
| 7/2/2014 | 1986 $50 GAE MS 70* | $ 6,400.00 | $ 2,585.00 | $ 3,815.00 |
| 7/2/2014 | 1986 $5 GAE MS 70 | $ 1,200.00 | $ 646.00 | $ 554.00 |
| 7/14/2014 | 1986 $50 GAE PF 70* | $ 2,100.00 | $ 1,880.00 | $ 220.00 |
| 7/7/2014 | Credit card overcharge | $ 2,100.00 | | |
| 7/21/2014 | 1988 $50 GAE MS 70 | $ 6,500.00 | $ 3,760.00 | $ 2,740.00 |
| 8/19/2014 | 1992 $25 GAE PF 70 | $ 8,600.00 | $ 999.00 | $ 7,601.00 |
| 9/17/2014 | 1995 $25 GAE MS 70 | $ 8,900.00 | $ 5,875.00 | $ 3,025.00 |
| 10/29/2014 | 1991 $25 GAE MS 70 | $ 12,500.00 | $ 7,703.00 | $ 4,797.00 |
| 4/1/2015 | 1988 $50 GAE MS70 / 1995 $25 GAE MS70 | $ 15,400.00 | $ 9,438.00 | $ 5,962.00 |
| 4/1/2015 | 2015 GAE MS70 (4 coin-set) | $ 8,900.00 | $ 2,631.70 | $ 6,268.30 |
| 4/1/2015 | 2013-W $50 G REVPF70 Buffaloes (2)* | $ 2,800.00 | $ 2,800.00 | $ - |
| 5/1/2015 | 1987-1991 $25 GAE PF69 (5 coin-set) | $ 6,000.00 | $ 3,500.00 | $ 2,500.00 |
| 6/17/2015 | 1989 $25 GAE MS70 | $ 21,000.00 | $ 8,225.00 | $ 12,775.00 |
| 6/17/2015 | Credit card overcharge | $ 500.00 | | |
| | **Losses on Coin Transactions** | **$ 189,739.00** | **$ 70,958.95** | **$ 101,630.05** |
| | * Coins taken by Defendants and not returned | | | |
| | 1986 $50 GAE MS 70 | | | $ 6,400.00 |
| | 1986 $50 GAE PF 70 | | | $ 2,100.00 |
| | 2013-W $50 G REVPF70 Buffaloes (2) | | | $ 2,500.00 |
| | **Estimated Losses incurred by Curtis** | | | **$ 112,630.05** |

19.     Once Defendants convinced Curtis to purchase the above-listed coins using the interstate wires, Curtis gave them a credit card number that Defendants charged over the interstate wires to pay for the coins.  The Defendants then sent the fraudulently misrepresented coins, along with sales receipts, to Curtis at his residence in Louisiana via the interstate mails.  Thus, for each coin purchase, Curtis received a sales receipt from the Defendants "after the fact;" meaning, after— not before—he paid for each coin purchase, he received a sales receipt from Defendants listing the coins he purchased.   Plaintiff utilized interstate phone and wire services to confirm the credit card transactions on the coin purchases listed above (excluding one transaction where the coins were hand-delivered). The Defendants routinely used the United States Postal Service and other interstate delivery services to deliver the coins and consummate the fraudulent activity.

20.     The above-listed coins were not worth the prices Curtis paid for them when they were purchased, and they have not attained such value to date nor provided the safe haven or return on investment as promised by Defendants.

21.     Defendants and their employees utilized unlawful, false, misleading and unconscionable high-pressure sales tactics to convince Curtis to purchase the grossly overvalued coins by, *inter alia*, knowingly, intentionally and falsely representing

**(a)**     the current value of the coins with full knowledge that the coins were not worth the value at which they were purchased and will never provide the return of investment as represented;

**(b)**     Failing to disclose that the fair market value of the coins was substantially less than the amount paid;

**(c)**     Misleading Curtis into believing that Defendants wanted to assist him in making sound investments;

**(d)**     Making unauthorized transactions on Curtis's credit card without his knowledge or approval;

**(e)**     Selling coins entrusted to Defendants without Curtis's permission;

     **(f)**     Failing to reimburse Curtis for coins sold; and,

     **(g)**     Performing other acts of deception and misrepresentation that may be discovered during the course of this litigation.

**22.**     As a direct and/or proximate result of Defendants' above wrongful acts and practices, Curtis has suffered (and continues to suffer) substantial economic damages, which Defendants refuse to remedy.  This case has resulted.

## CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I

**DEFENDANTS JUSTIN L. ALBANESE AND ADAM S. JACKSON
A PATTERN OF UNLAWFUL ACTIVITY UNDER 18 U.S.C. § 1961, *ET SEQ.*:
MAIL FRAUD AND WIRE FRAUD**

**23.**     The preceding factual statements and allegations are incorporated by reference.

**24.**     By engaging in the above-described open-ended scheme to defraud Curtis—that also was a consistent, regular and dominant part of the manner in which Defendants Albanese and Jackson participated in and conducted the day-to-day business affairs of PRCC—these Defendants instigated, perpetrated and executed a scheme to defraud Curtis; to wit, Albanese  and Jackson engaged in repeated and systematic mail fraud and wire fraud (as described above) in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated unlawful coin sales to Curtis (as described above) that, in turn, generated exorbitant compensation for them.  Albanese and Jackson caused PRCC, to use the interstate mails and wires to repeatedly make and/or send fraudulent solicitations, sales receipts and/or purchase confirmations to Curtis for the above-described coin transactions.  As such, Albanese and Jackson conducted and/or participated in the business and financial affairs of PRCC (the RICO Enterprise) through a pattern of racketeering activity (to wit, repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§

1341; 1343) (as described above) that generated multiple and repeated unlawful coin sales to Curtis that, in turn, generated exorbitant compensation for them. Albanese and Jackson committed these substantive RICO offenses, all the while knowing about, and agreeing to, the overall objective of the fraud—generating exorbitant compensation for themselves. By their unlawful actions, therefore, they (i) conducted and/or participated in the affairs of PRCC (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired with others (the identities of whom are only known by them at this stage in the litigation) to violate 18 U.S.C. § 1962(b); (c) (in violation of 18 U.S.C. §1962(d)), and defrauded Curtis (and possibly other customers) in the process.

**25.** Albanese and Jackson caused PRCC to engage in this fraudulent scheme with the intent, *inter alia*, to (i) shift the burden of proof to Curtis knowing he does not have unlimited resources and (ii) generate exorbitant compensation for themselves. Albanese's and Jackson's wrongful actions and fraudulent scheme constitute mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343.

**26.** The multiple, repeated and continuous acts of mail fraud and/or wire fraud described in Paragraphs 12 and 17 (above) constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5). Nothing about Albanese's and Jackson's schemes to defraud Curtis indicated that the schemes would ever terminate. Moreover, and independent of the duration of the scheme, their wrongful acts were a consistent, regular and dominant part of the manner in which they participated in, conducted the day-to-day business and financial affairs of PCA and PCICG, respectively.

## COUNT II

## VIOLATION OF 18 U.S.C. § 1962(c)
## (AGAINST JUSTIN L. ALBANESE AND ADAM S. JACKSON)

27.     The preceding factual statements and allegations are incorporated by reference.

28.     PRCC is an "enterprises" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

29.     Albanese and Jackson are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

30.     Albanese and Jackson conducted and/or participated in the business and financial affairs of PRCC (the RICO Enterprises) through patterns of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 2; 1341; 1343, set forth above.

31.     Albanese's and Jackson's patterns of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) (*see* Paragraphs 12 and 17, above) proximately and/or directly caused Curtis to suffer injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, Curtis was damaged by, *inter alia*, the fraudulent and inflated prices he paid for the above-listed coins, consequential damages related to the funds he borrowed to purchase the coins, and the corresponding mental anguish he suffers.  Albanese and Jackson committed these substantive RICO offenses by using PRCC to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves.  They knew their tactics and marketing practices were misleading and unlawful and would cause Curtis to suffer damages that were reasonably

foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

## COUNT III

### VIOLATION OF 18 U.S.C. § 1962(d) BY
### CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)
### (AGAINST ALBANESE AND JACKSON)

**32.**     The preceding factual statements and allegations are incorporated by reference.

**33.**     Paramount Rare Coins & Currency (PRCC) is the "enterprises" that was engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

**34.**     Albanese and Jackson are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

**35.**     Albanese and Jackson conspired with other persons (the identities of whom are only known by them at this stage in the litigation) within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, they conspired to conduct and/or participate in the business and financial affairs of PRCC (the RICO Enterprise) through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(c); 1961(5); and 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 2; 1341; 1343, set forth above.

**36.**     Albanese's and Jackson's pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) proximately and/or directly caused Curtis to suffer injury to her business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, Curtis was damaged by, *inter alia,* the fraudulent and inflated prices she paid for the above-listed coins.  Albanese and Jackson, through their representatives, agreed to commit these substantive RICO offenses by using PRCC

to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Curtis to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their patterns of unlawful activity.

## COUNT IV
## FRAUD AND/OR FRAUDULENT CONCEALMENT

37.       The preceding factual statements and allegations are incorporated herein by reference.

38.     In order to sell the overvalued coins to Curtis, Defendants utilized one or more of the above unlawful, false, misleading and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry.  Specifically, Defendants and their employees falsely and/or misleadingly represented to Curtis that he was a "preferred customer," Curtis "needed the coins," Curtis was "getting a good deal," and Curtis "would not lose any money" on the purchases.  Defendants and their employees also falsely represented the current value of the coins with full knowledge that the coins were not worth the value at which they were purchased nor will the coins attain the return of investment as promised.

39.     Defendants, by and through their salesmen, made the above false representations to Curtis with the intent that he rely upon them and with full knowledge that such representations were false when made.  Curtis relied on Defendants' material and false representations when deciding to purchase the grossly overvalued coins which, in fact, he purchased to his financial detriment and Defendants' financial gain.  As a direct and/or proximate result of Defendants' false and misleading representations about the overvalued coins, Curtis suffered (and continue to

suffer) damages in the form of, *inter alia,* the amounts paid to Defendants for the gold coins in excess of their value, consequential damages related to the funds he borrowed to purchase the coins and mental anguish damages.

**40.**     Defendants also concealed their wrongful actions until a significant amount of the damage to Plaintiff was done.     All of the above facts were material to Curtis's decision to purchase coins from Defendants.

**41.**     By virtue of the confidential business relationship between Plaintiff and Defendants, Defendants had a duty to disclose the above concealed material facts to Plaintiff.     Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above concealed material facts, is the equivalent of false representations and/or omissions.     Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiff's rights and interests.

**42.**     Plaintiff justifiably relied on Defendants' false representations and/or omissions to his financial detriment by purchasing the grossly overvalued coins.     Defendants' wrongful actions constitute fraud at Texas common law.

**43.**     Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiff.     Plaintiff was not aware of, nor, through the exercise of due diligence, could have become aware of Defendants' wrongful actions until such wrongful actions were committed and brought to light by third parties.     Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Defendants had a duty to disclose to Plaintiff the above material false information.     Defendants' failure to do so constitutes fraudulent concealment at Texas common law.

## COUNT V

## NEGLIGENT MISREPRESENTATION

**44.**     The preceding factual statements and allegations are incorporated herein by reference.

**45.**     Defendants made certain representations to Plaintiff in the course of their business and in transactions in which Defendants had a substantial monetary interest.  Defendants also supplied false information for the specific purpose of guiding Plaintiff in his purchase of the grossly overvalued coins.

**46.**     Defendants, however, failed to exercise reasonable care and competence in obtaining and communicating such information to Plaintiff by, *inter alia,* utilizing one or more of the above unlawful, false, misleading and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry and/or making the above false and material misrepresentations and omissions.

**47.**     Curtis justifiably relied on Defendants' negligent misrepresentations when purchasing the grossly overvalued coins, which directly and/or proximately caused him to suffer damages to the financial benefit of Defendants.   Defendants' wrongful conduct constitutes negligent misrepresentation at Texas common law.

## COUNT VI
## NEGLIGENCE

**48.**     The preceding factual statements and allegations are incorporated herein by reference.

**49.**     Defendants negligently valued, promoted, marketed, advertised and sold grossly overvalued gold and platinum coins to Plaintiff.  In doing so, Defendants owed a duty to Plaintiff to exercise reasonable care in valuing, promoting, marketing, advertising and selling the coins. Defendants breached their duty to Plaintiff by failing to exercise reasonable care in valuing, promoting, marketing, advertising and selling the coins to Plaintiff. Defendants' wrongful

conduct directly and/or proximately caused Curtis to suffer damages. Defendants' wrongful conduct constitutes negligence at Texas common law.

**COUNT VII**

**VIOLATIONS OF THE TEXAS DECEPTIVE**
**TRADE PRACTICES-CONSUMER PROTECTION ACT**

**50.**    The preceding factual statements and allegations are incorporated herein by reference.

**51.**    Plaintiff is a "consumer" under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), pursuant to Section 17.45(4) of the Texas Business and Commerce Code. Defendants are "persons" that may be sued under the DTPA, pursuant to Section 17.45(3) of the Texas Business and Commerce Code.

**52.**    By their above wrongful acts and/or misrepresentations, Defendants engaged in false, misleading and deceptive acts and practices in violation of Sections 17.50(a)(1) and 17.46(b) of the Texas Business and Commerce Code; to wit, Defendants, *inter alia*, (i) represented that the coins have value that they do not have and that significant investor and collector demand exists for the coins that will cause them to appreciate in value, which does not exist and will not happen (Section 17.46(b)(5)), (ii) represented that the coins are rare and/or unique and have substantial desire to investors and collectors, which will cause the coins to appreciate significantly in the future, which they are not (Section 17.46(b)(7)), and (iii) failed to disclose the above information about the coins, which Defendants knew at the time of the transactions, with the intent to induce Plaintiff to purchase the coins that Plaintiff would not have purchased had Defendants disclosed such information (Section 17.46(b)(24)). Plaintiff relied on Defendants' above misrepresentations and omissions in purchasing the gold and platinum coins to his financial detriment.

53.     By their above wrongful acts and/or misrepresentations, Defendants also violated Section 17.50(a)(2) of the Texas Business and Commerce Code by breaching the implied and/or express warranties they made to Plaintiff that the coins have value and that significant investor and collector demand exists for the coins that will cause them to appreciate significantly in value.

54.     By their above wrongful acts and/or misrepresentations, Defendants also violated Section 17.50(a)(3) of the Texas Business and Commerce Code by engaging in unconscionable actions and/or an unconscionable course of action because such wrongful acts and practices took advantage of Plaintiff's lack of knowledge, ability, experience and/or capacity to a grossly unfair degree to Plaintiff's financial detriment.

## COUNT VIII
## CONSPIRACY

55.     The preceding factual statements and allegations are incorporated herein by reference.

56.     Defendants (and possibly others), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above.  By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purposed by an unlawful means.  As such, Defendants conspired to commit the wrongful actions outlined in Counts I-IV, above, all of which directly and proximately caused Plaintiff to sustain actual and consequential damages.  Defendants' wrongful actions constitute civil conspiracy at Texas common law.

## COUNT IX
## MONEY HAD AND RECEIVED

57.     The preceding factual statements and allegations are incorporated by reference.

58.     By their above-described wrongful actions and/or inaction, Defendants hold money obtained by a) the wrongfully charged and collected purchase prices paid by Curtis for the grossly overvalued coins misrepresented and sold to her by Defendants; and b) coins impermissibly sold to third parties and the funds retained without payment to Curtis or replacement of his coins, that, in equity and good conscience, belongs to Curtis. Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds under the equitable doctrine of money had and received.

## COUNT X
## UNJUST ENRICHMENT

59.     The preceding factual statements and allegations are incorporated herein by reference.

60.     Defendants (and possibly other persons and entities, including Defendants'. employees) have been unjustly enriched by (i) being paid an excessive value for coins that are not supported by any reasonable valuation; (ii) using the fraudulently obtained revenues and profits paid by Curtis, and (iii) generating a return on the amounts described in (i) and (ii). Accordingly, Curtis seeks to impose a constructive trust over (and recover) all amounts by which Defendants (and possibly other persons and entities, including Defendants' employees) have been unjustly enriched.

## TOLLING OF THE STATUTES OF LIMITATION

61.     The preceding factual statements and allegations are incorporated herein by reference.

62.     **EQUITABLE ESTOPPEL.** Defendants took active steps to conceal their above wrongful actions and/or inaction. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody and control, and await further discovery. At such time as this material information was first revealed to Curtis, he exercised due diligence by retaining counsel

and pursuing his claims.  As such, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

63.    **EQUITABLE TOLLING.**  Defendants took active steps to conceal their above wrongful actions and/or inaction.  The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody and control, and await further discovery.  Even by exercising reasonable diligence, Curtis could not have discovered this information if for no other reason than he had no reason to make such inquiries.  At such time as this material information was first revealed to Curtis, he exercised due diligence by retaining counsel and pursuing his claims.  As such, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable tolling.

## RESPONDEAT SUPERIOR

64.    The preceding factual statements and allegations are incorporated herein by reference.

65.    Defendants also are liable for the above wrongful acts committed by their employees during the course and scope of their employment by the Defendants; to wit, the employees' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the employees were hired (*i.e.*, selling overvalued platinum and gold and platinum coins to customers like Plaintiff)—all of which directly and/or proximately caused Plaintiff to suffer damages to the financial benefit of Defendants—under the doctrine of *respondeat superior.*

## RELIEF REQUESTED

66.    The preceding factual statements and allegations are incorporated herein by reference.

67.    **RECISSION.**  Based on Defendants' above wrongful conduct, Plaintiff is entitled to recission of the transaction(s) pursuant to which Defendants fraudulently sold the coins to Plaintiff.

68.    **ACTUAL AND CONSEQUENTIAL DAMAGES.**  In the alternative, and as direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered (and continues to suffer) damages in the form of, *inter alia*, the amounts paid to Defendants for the gold coins in excess of their value.  In any event, Plaintiff is entitled to recover consequential damages related to the funds he borrowed to purchase the coins and the mental anguish he has suffered in connection with these transactions—in an amount to be determined by the trier of fact.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

69.    **PUNITIVE DAMAGES.**  Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiff's rights and interests.  Accordingly, Plaintiff also is entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.  Punitive damages are not capped or limited because Defendants' wrongful conduct constitutes a felony under Section 32.46 and Chapter 31 of the Texas Penal Code. *See* Section 41.008(c) of the Texas Civil Practice and Remedies Code.  All conditions precedent to Plaintiff's claim for relief have been performed and/or occurred.

70.    **TREBLE DAMAGES.**  Plaintiff also is entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute and the Texas DTPA, under 18 U.S.C. § 1964 (c) and Section 17.50(b)(1) of the TEXAS BUSINESS AND COMMERCE CODE.  All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

71.    **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.**  Plaintiff also is entitled to recover his reasonable and necessary attorneys' fees, litigation expenses and court costs in

prosecuting this action pursuant to, *inter alia*, Section 38 of the Texas Civil Practice and Remedies Code and/or Section 17.50(d) of the Texas Business and Commerce Code.

**WHEREFORE,** Plaintiff requests that upon final trial or hearing, judgment be awarded against the Defendants, jointly and severally for:

(a)    With respect to Counts I-III (violations of 18 U.S.C. § 1961, *et seq.*)--

    (i)    threefold the actual damages sustained by Curtis with costs of suit, attorneys' fees, litigation expenses and court costs, all under 18 U.S.C. § 1964(c), with pre- and post-judgment interest at the highest legal rates; and

    (ii)    equitable relief, as may be appropriate, under 18 U.S.C. § 1964(a), including an equitable accounting for all benefits, consideration and profits received, directly or indirectly, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits.

(b)    With respect to Counts IV-IX:

    (i)    rescission;
    (ii)    actual damages to be determined by the trier of fact;
    (iii)    punitive damages;
    (iv)    treble damages;
    (v)    all amounts by which Defendants have been unjustly enriched;
    (vi)    an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;
    (vii)    pre- and post-judgment interest at the highest legal rates;
    (viii)    attorneys' fees and litigation expenses incurred through the trial and any appeals of this case;
    (ix)    costs of suit; and
    (x)    such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all of his claims and causes of action so triable.

Respectfully submitted,

**STEVENS BALDO & LIGHTY, PLLC**
550 Fannin Street, Suite 700
Beaumont, TX 77701
(409) 835-5200
(409) 838-5638(f)


By: */s/ R. Lyn Stevens*_____
    R. Lyn Stevens
    State Bar No. 19189020

**ATTORNEYS FOR PLAINTIFF,
ERIC CURTIS**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been hand delivered to counsel of record for Defendants on this the 16th day of April February, 2018.


*/s/ R. Lyn Stevens*_____
R. Lyn Stevens